(Summit County Court of Common Pleas.)

E. H. MERRILL ET AL. v. H. G. CURRIER.

1. When Inlying Lands Surrounded by Wasteweirs do not Vest in the State—Wasteweirs constructed by the state, for carrying off surplus waters from the Ohio canal to a natural stream, and mingling therewith, until said surplus waters are again introduced into the canal below,-do not, ipso facto, constitute such appropriation of the inlying lands bounded by the canal and such wasteweir and natural streams, as to vest in the state a fee therein, unless said inlying lands were necessary for the construction and maintenance of the canal, and were actually taken and occupied by the state for that purpose. .

2. Title Acquired by the State—But the state did thereby acquire such title to so much land as was reasonably necessary to carry said surplus waters to said natural stream that it actually took for such purpose, and the right in perpetuity to transmit the same in said natural stream.

3. Presumption of Appropriation—The mere fact that such wasteweir, natural stream, and the canal, surround such tract of land, does not create a presumption that the state apporpriated such inlying land for the puprose of its canal; to create such presumption, there must have been an actual and obvious appropriation of such inlying lands by the state for such purpose.

(Decided May, 1893.)

---

VORIS, J.

This case was submitted to the court and heard upon the evidence.

The contention arises over a parcel of land lying between Center and State streets of the city of Akron, and Wolf run and the Ohio canal; and the legal effect arising from the construction and maintenance of a wasteweir or spill from the canal level between locks two and three, which passes some of the surplus waters of that level through an artificial channel from the canal to Wolf run, along and mainly in State street; said Wolf run being a natural stream, the waters of which, so augmented by the waters of this wasteweir or spill, are introduced into the canal in the level below   This parcel of land, being of irregular form, say not far from two hundred feet long, and of varying width, of say from about fifty to one hundred feet.

The state claims to own these lands in fee, as being part of its canal; and leased them to the defendant for the period of five years , for private ends and uses of his own; and founds its title thereto in the authority conferred by the eighth section of the act "To provide for the internal improvement of the state of Ohio, by navigable canals," passed February 4, 1825.   That under and by virtue of this act, the state appropriated this parcel of land for the purpose of constructing and maintaining the canal, and has ever since claimed said land so appropriated, as a part and parcel of its canal.

The plaintiffs assert as a matter of fact, that the state did not appropriate this parcel of land, or any part of it, for the purpose of its canal,

and deny that the state had the right to appropriate it, if it ever attempted so to do, as the canal was actually located, constructed and maintained; or that it ever occupied any part thereof, except for the purpose of transmitting said surplus waters in and along said natural stream which forms the eastern boundary of the lands in contention; and that before, and ever since February 4, 1825, the plaintiffs and their predecessors in title, have had the uninterrupted, peaceable, adverse and notorious possession of said parcel of land, claiming title thereto.

The determination of the rights of the parties, involves the solution of questions of law and of fact.

That this act gave the officers, engineers and agents of the state power to appropriate these lands to the purposes of its canal, cannot be doubted; and that the state acquired the title in fee to such lands as were so actually appropriated, is not disputed. But the power so conferred, must not be arbitrarily executed. Constitutional limitations ought to be regarded.

The policy of the state has always been, since its organization, to protect the right of the private owner to his property. The constitution of 1802, provided that "Private property ought and shall ever be held inviolate, but always subservient to the public welfare, provided a compensation in money be made to the owner." Article VIII, section 4. This section was incorporated into the constitution of 1851, with additional safeguards.

The supreme court at an early day, gave construction to this statute, and held that the state in the exercise of its authority, could not take the property of a private party, either for the purpose of constructing, maintaining or operating its canal, in a manner that would do unnecessary damage to the proprietor; and held that the state was limited in its appropriation, to such property as was necessary to be used for the purposes of a canal alone, and beyond that, it had no power to go. Cooper v. Williams, 5th Ohio Report, 391; McArthur v. Kelly, 5th Ohio, 139; Buckingham v. Smith, 10th Ohio, 288.

The foregoing principle is fully sustained in Cooper v. Williams. In McArthur v. Kelly, page 145, Collett, J., says: "All the authority which the commissioners have to enter on or take from the owner, without his consent, any lands, or interest in lands, or materials for any work whatever, is given in the act to provide for the internal improvement of the state of Ohio by navigable canals, passed Febuary 4, 1825. By this act, they are directed to enter on and take possession of land, water and materials necessary for the construction and making the canal navigable, and for no other purpose."

In these cases, the authority is clearly recognized that courts of equity may enjoin the state and its officers and agents, when they exceed the powers conferred upon them by the statute.

Guided by these principles of interpretation of the statute—perhaps I should say, declared limitations upon this exercise of eminent domain by the state, in taking lands for making and maintaining its canal—and it must all the while be remembered that these are fundamental, and of invariable application whenever the rights of the private owner are sought to be made subservient to the public use, against the consent of the owner—we come to a consideration of the conclusion of facts as we think are established by a preponderance of the evidence.

What is the character and effect of the wasteweir or spill, which defendants claim constitutes the right of the state to the lands in contention? Was it necessary to appropriate this parcel of land for the purpose

of a canal? Did the state in fact appropriate it to that purpose; or did it in fact appropriate the lands in contemplation for any purpose? We think his weir or spill was part fo the original construction of the canal, and does not come within the designation of "regulating weirs" afterward constructed around the locks of the canal, with the exception of a few where the particular location rendered them unnecessary.

The character and purpose of this wasteweir are these: this wasteweir is a structrue cut through the towing path near the middle of the level of the canal, and is so constructed as to spill over the towing path bank of the canal, on to the lands below; the surplus waters of this level, which by their own gravitation, spill over the structure in the towing path, and from thence flow along and through State street to Wolf run, and thence flow with the waters of the natural stream until the same debouch into the canal below lock three; and at which point the waters of this level also constitute a water power near lock three, which ordinarily takes all the surplus water of the level. The wasteweir constitutes a spill for the level, to relieve it from stormwater or other extraordinary surfeit of waters. The only possible necessity the canal could have for land beyond the towing path bank was to pass these surplus waters in an artificial channel from the spill to the natural stream, where the natural stream took them downward as it did its waters; no part of the bed of this artificial stream passed out of State street, nor did its waters pass on to this parcel of land except as they were incorporated into the natural stream as a part thereof.

We have no doubt the state did acquire the right to the land constituting the bed of the artificial stream, from the spill to the natural stream, but this bed does not constitute any part of the land in contention, and also acquired the right to have these surplus waters transmitted within the banks of the natural stream, in perpetuity, to the extent that the lands constituting Wolf run are essential to the transmission of these waters, and within these limits are made subservient to this burden; but for any other purpose we can conceive of no necessity. To this extent, the state had the right to injure the private owner, but it must do no unnecessary injury—could take no more land than necessary for the purposes of a canal. The lands within the boundaries named constituted no part of the canal—could be used neither for canal construction, nor canal maintenance.

The state has never been in the actual occupancy of this parcel of land, except as just stated. Structures of this sort were usual in canal construction and maintenance. This is especially true in this city. Several very valuable private properties are located within the boundaries formed by such wasteweir streams and the canal, the title or use of which has ever remained in the private owners without question. From my personal observation, I know that the spills of the Summit level into the Tuscarawas river, at the feeder and other places, before the waters are returned to the canal, go to Clinton, a distance of some nine or ten miles, and embrace within their boundaries with the river and canal, hundreds of acres of valuable land. During the first fifteen or eighteen years of the existence of the canal, the two and one-half mile level between locks twenty-four and twenty-five, had four such wasteweirs or spills, and since 1842 or 3, has maintained three. Adopting the rule claimed by the defendant, would give to the state entire farms, which are embraced within the boundaries of the wasteweir stream, the canal and the natural stream into which the waters flow. The private owners of these lands have lived for two-thirds of a century on these lands, improved, alienated, and transmitted them to their children by descent and devise securely resting

in the belief that these wasteweirs had no other legal effect on their titles than to create a servitude on their lands for the transmission of the waste waters of the canal to the natural stream, and by them to be transmitted beyond their respective properties, the state all the while acquiescing in the dominion of these private owners—thus giving unequivocal construction to the understanding that it did not appropriate such inlying lands for the purposes of the canal.

If the view contended for by the defendant was to obtain, the state might claim thousands of acres of agricultural lands within the boundaries above stated. In the absence of convincing evidence to the contrary, we cannot presume that the state appropriated these intervening lands in contention in this action for the purpose of its canal, and it could appropriate them for no other purpose. No part of these leased lands constitute any other part of the canal. The body or prism of the canal, is wholly off of any part thereof. We think it was wholly unnecessary to appropriate any part of these leased lands for the purposes of the canal. Nor do we think the state acquired any right to lands not essential to transmit these surplus waters, and the leased lands certainly were and are not necessary for that purpose, except as transmitted in said natural stream.

The fact that no maps, profiles, deeds or any other muniments of title which the state directed to be made and preserved as evidence of the lands devoted to the purpose of the canal, have been produced on the trial, by no means strengthens the claim of the defendant that the state appropriated these lands for any purpose whatever, except as Wolf run became burdened with the servitude to transmit these surplus waters.

The lease made by the state to the defendant, excludes the idea that these lands were needed for the purpose of making and maintaining the canal. They are leased to a private person for his own private ends, and not for the purposes of a canal, or any other public use.

Even if these lands had been appropriated by the state for the purposes of a canal, it had no power to make the lease to defendant; for the purposes of the lease are inconsistent with the public use for which the state could appropriate lands, to-wit, the construction and maintenance of a navigable canal. McArthur v. Kelly, 5th Ohio, 139, clearly announces the principle that the state cannot use lands for the purposes of renting to others for private purposes.

It is not claimed that the state acquired these lands by grant to augment its construction fund, or to enable the state to utilize hydraulic power for its surplus waters.

We think both the law and the facts as developed by the evidence are against the claim set up by the defendant. We find the issues with the plaintiff, and decree accordingly, however confirming to the state the right to transmit the surplus waters of this level through Wolf run, through and over the premises of the plaintiff.